1  WILLIAM S. LERACH (68581)
   JOHN E. GRASBERGER (89774)
2  MILBERG WEISS BERSHAD
      HYNES & LERACH
3  600 West Broadway, Suite 1800
   San Diego, CA  92101
4  Telephone:  619/231-1058

5  WRIGHT & BONDS
   EDWARD L. WRIGHT
6  STEVEN E. CAULEY
   Centre Place, Suite 900
7  Little Rock, AR  72201
   Telephone:  501/376-2500

8
   Attorneys for Plaintiff
9

10

11                UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13
   MARK PFEIFER, On Behalf of Himself  ) Civ. No. 1862 LGB (Brx)
14 and All Others Similarly Situated,  )
                                       ) CLASS ACTION
15                         Plaintiff,  )
                                       ) COMPLAINT FOR VIOLATION OF
16      vs.                            ) THE FEDERAL SECURITIES LAWS
                                       )
17 THOMAS A. McFALL, PAUL M. BROCKMAN, )
   DAVID R. FOX, ALBERT LEVIE, RUSHTON )
18 O. BACKER, MARNE OBERNAUER, SR. AND )
   HAMBURGER HAMLET RESTAURANTS, INC., )
19                                     )
                           Defendants. ) Plaintiff Demands A
20 _____ ) Trial By Jury

21

22

23

24

25

26

27

28

FILED
CLERK, U.S. DISTRICT COURT

MAR 24 1994

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

```
03/24/94                    10:39:20 AM
LA   1-2 AFT          Receipt # 120651
=====NO REFUND WITHOUT RECEIPT=====
CASE # 94-1862

086900    FILING FEE  CIVIL
                        60.00
510000    SPECIAL FUND F/F
                        60.00
===== T O T A L =====
                       120.00
   CHECK TENDERED $          $120.00
=====NO REFUND WITHOUT RECEIPT=====
```

1   All allegations made in this Complaint are based on informa-

2   tion and belief except those allegations which pertain to the named

3   plaintiff and his counsel, which are based upon personal knowledge.

4   Plaintiff's information and belief is based, _inter alia_, on the

5   investigation made by and through his attorneys.

6                   **INTRODUCTION AND OVERVIEW OF ACTION**

7        1.   This is a class action lawsuit brought against Hamburger

8   Hamlet Restaurants Inc. ("Hamlet" or the "Company"), and its

9   directors.   These claims are brought on behalf of all persons (the

10   "Class") who purchased the common stock of Hamlet between November

11   21, 1991 and April 1, 1993, inclusive (the "Class Period"), seeking

12   to pursue remedies under the Securities and Exchange Act of 1934.

13   During the Class Period, the defendants caused or permitted Hamlet

14   to publicly issue misleading financial statements and other false

15   statements in annual and quarterly reports to shareholders, press

16   releases and interviews with securities analysts regarding Hamlet,

17   its business, the status of its operations, its earnings, its

18   capacity to achieve profitable growth, its ability to maintain its

19   ambitious expansion plans, and its future business prospects.   The

20   information provided by the defendants was materially false and

21   misleading   when   issued   and   had   the   purpose   and   effect   of

22   artificially inflating the market price of Hamlet common stock

23   throughout the Class Period.

24        2.   As a result of the defendants' wrongful conduct, Hamlet

25   stock reached a high of over $20 per share during the Class Period,

26   during which three of the individual defendants profited from their

27   wrongdoing by selling shares of the Company's stock into the

28   inflated   market.     However,   when   the   truth   of   Hamlet's   prior

1    improper accounting practices, its unachievable expansion program,
2    its earnings problems and its severely diminished future prospects
3    became known, its common stock ultimately collapsed to below $6 per
4    share.

5        3.    Prior to 1988, Hamburger Hamlet had been a public
6    company.    However, in May 1988 an investor group including
7    defendant Thomas McFall took the Company private in a leveraged
8    buyout.    In order to get relief from the debt load which the
9    Company had incurred as a part of the buyout, and because the
10   lender was calling its debt, the Company commenced an initial
11   public offering on November 21, 1991, selling approximately 2.5
12   million shares to the public at $11.50 per share.

13       4.    In order to insure the success of the offering and
14   thereafter to inflate the price of the stock, during the Class
15   Period the defendants represented to the investing public, inter
16   alia, (a) that they were successfully pursuing a well-planned
17   strategy for expansion, which would result in steady revenue
18   growth, improved earnings, and increased earnings per share; (b)
19   that they had recently completed a restaurant renovation program
20   such that no further extraordinary maintenance expenses would be
21   necessary with regard to the older restaurants; (c) that the new
22   restaurants were doing extraordinarily well and were exceeding
23   management expectations; (d) that the Company could continue to
24   expand using internally-generated funds and available credit lines
25   because they had trimmed expenses, which they expected would
26   decrease even further, and (e) that Hamlet was successfully meeting
27   competitive pressures and achieving continued success.

28

                                - 2 -

1          5.    The above representations, and others made by defendants
2    throughout the Class Period, were false and misleading.   In fact,
3    defendants knew from internal, undisclosed corporate data that: (a)
4    positive reported earnings were being maintained only as a result
5    of  postponing  necessary  maintenance,  upgrades,  and  remodeling
6    expenses and by improperly capitalizing new-restaurant pre-opening
7    expenses; (b) the Company had done no marketing studies to support
8    its "expansion strategy" and, in fact, there was great dissension
9    among top management about the location and number of possible new
10   restaurants; (c) the Company was not able to expand as represented
11   without significantly increasing its debt; (d) the new restaurants
12   were providing the Company with an inadequate return on investment;
13   and (e) Hamlet was facing softening demand for its products as a
14   result of competitive pressures, failure to offer promotions and
15   discounts, an increasingly-unpopular menu, and outdated facilities.

16         6.    The purpose of these activities by the defendants was to
17   artificially maintain and/or increase the price of Hamlet's common
18   stock in order to, inter alia:

19              (a)   Facilitate the public offering so that the Company
20   could pay off its crushing debt;

21              (b)   Allow the sale of Hamlet stock by defendants for
22   their personal benefit at substantially higher prices than what
23   would be available in the marketplace were the true facts known to
24   the investing public;

25              (c)   Justify and permit the perpetuation of extravagant
26   salaries, benefits and perquisites being enjoyed by the Hamlet
27   defendants; and

28

- 3 -

1         (d). Cover up and conceal the mismanagement of the

2 Company by its top executives.

3     7. Defendants' plan and scheme ultimately unravelled

4 beginning on April 1, 1993, when the Company revealed that its

5 same-store sales in the first quarter were down by more than 5%.

6 Thereafter, the Company reported earnings well below amounts

7 previously indicated, including a loss in the fourth quarter of

8 1993. In addition, the Company announced that it was renovating

9 and/or remodeling all of its Southern California restaurants; that

10 it was adopting a new menu; that it had begun running promotions

11 and offering discounts; that it was decreasing the number of

12 restaurants it expected to open; and that its President and Chief

13 Financial Officer, defendant Paul Brockman, had first been replaced

14 as CFO and then had resigned.

15     8. As the truth about Hamlet's true condition was revealed

16 throughout 1993 and into 1994, Hamlet's stock declined from its

17 Class Period high of over $21 to less than $10 after the end of the

18 Class Period, and currently trades for approximately $5-6 per

19 share.

20     9. While buyers of Hamlet's stock during the Class Period

21 suffered millions of dollars in damages by purchasing Hamlet stock

22 at grossly inflated prices, Hamlet and its insiders did not fare

23 nearly so badly. The Company was able to pay off its debt with

24 money obtained from the Class members, and three of the individual

25 defendants pocketed over $2 million by selling 114,500 shares of

26 their stock into the open market at prices inflated by the fraud

27 they participated in.

28

- 4 -

10.   The charts set forth below show (a) the price action of Hamlet stock from November 22, 1991, to March 17, 1994, with defendants' insider selling, and (b) a comparison of Hamlet stock to the Dow Jones Restaurants Index, which demonstrates that the sharp increases in Hamlet's stock and its subsequent collapse were due to specific facts related to Hamlet and not due to factors affecting the restaurant industry generally:



Hamburger Hamlet
November 22, 1991 - March 17, 1994
Average Weekly Price Action



Hamburger Hamlet Restaurants, Inc.
November 21, 1991 - March 9, 1994
vs. Dow Jones Restaurants Index

Hamburger Hamlet ———
Index    - - -

## JURISDICTION AND VENUE

11.    Plaintiff brings this action pursuant §§10(b) and 20 of the Securities Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

12.    The Court has jurisdiction over this action pursuant to §27 of the Securities Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

13.    Venue is proper in this district pursuant to §27 of the Securities Exchange Act and 28 U.S.C. §1391(b).    Many of the acts and transactions complained of herein, including the dissemination of public statements and reports which contained materially false and misleading information and the sales of securities, occurred in substantial part in the Central District of California.    The

1   principal executive offices of the Company are located at 14156

2   Magnolia Blvd., Sherman Oaks, California.  The Hamlet defendants

3   live in and/or transact business in this District and many of

4   Hamlet's employees and other potential witnesses reside in this

5   District.

6       14.  In connection with the wrongful acts alleged in this

7   Complaint, defendants, directly or indirectly, used the means and

8   instrumentalities of interstate commerce, including the mails,

9   interstate telephone communications and the facilities of the

10   national securities exchanges.

11   <u>THE PARTIES</u>

12       15.  Plaintiff Mark Pfeifer purchased 75 shares of Hamburger

13   Hamlet common stock on August 4, 1992, for $12.50 per share and has

14   been damaged thereby.

15       16.  Defendant Hamburger Hamlet Restaurants, Inc. owns and

16   operates 31 restaurants in the Southern California, Washington,

17   D.C., and Chicago metropolitan areas.  Since November 21, 1991, the

18   common stock of the Company has been traded in an open and

19   efficient market on the over-the-counter NASDAQ National Market

20   System ("NASDAQ") under the symbol HAMB.  As of November 13, 1993,

21   there were approximately 4 million shares of the Company's common

22   stock outstanding.

23       17.  Defendant Thomas A. McFall ("McFall") was, at all

24   relevant times, Chairman and Chief Executive Officer of the

25   Company.  During the Class Period defendant McFall, while in

26   possession of the non-public information particularized herein,

27   sold 102,500 shares of the Company's common stock for proceeds of

28   $1,848,475.  Because of McFall's position with the Company, he had

- 7 -

1     access to the adverse non-public information about its business,
2     finances, products, markets and present and future business
3     prospects via access to internal corporate documents (including the
4     Company's operating plan(s), budget(s), and forecast(s) and reports
5     of actual operations compared thereto), conversations and
6     connections with other corporate officers and employees, attendance
7     at management and Board of Directors' meetings and committees
8     thereof, and via reports and other information provided to him in
9     connection therewith.

10         18. Defendant Paul M. Brockman ("Brockman") was, at all
11     relevant times, the President and Chief Financial Officer of the
12     Company. During the Class Period defendant Brockman, while in the
13     possession of the non-public information particularized herein,
14     sold 10,000 shares of the Company's common stock for proceeds of
15     $189,000. Because of Brockman's position with the Company, he had
16     access to the adverse non-public information about its business,
17     finances, products, markets and present and future business
18     prospects via access to internal corporate documents (including the
19     Company's operating plan(s), budget(s), forecast(s) and reports of
20     actual operations compared thereto), conversations and connections
21     with other corporate officers and employees, attendance at
22     management and Board of Directors' meetings and committees thereof,
23     and via reports and other information provided to him in connection
24     therewith.

25         19. Defendant David R. Fox ("Fox") was, at all relevant
26     times, Executive Vice President of the Company. Because of Fox's
27     position with the Company, he had access to the adverse non-public
28     information about its business, finances, products, markets and

1 | present and future business prospects via access to internal
2 | corporate documents (including the Company's operating plan, budget
3 | and forecast and reports of actual operations compared thereto),
4 | conversations and connections with other corporate officers and
5 | employees, attendance at management and Board of Directors'
6 | meetings and committees thereof, and via reports and other
7 | information provided to him in connection therewith.

8 | 20. Defendant Albert Levie ("Levie") was, at all relevant
9 | times, a director of the Company. During the Class Period,
10 | defendant Levie, while in possession of non-public information
11 | particularized herein, sold 2,000 shares of the Company's common
12 | stock for proceeds of $33,000. Because of Levie's position with
13 | the Company, he had access to the adverse non-public information
14 | about its business, finances, products, markets and present and
15 | future business prospects, via access to internal corporate
16 | documents (including the company's operating plans, budgets and
17 | forecasts and reports of actual operations compared thereto),
18 | conversations and connections with other corporate officers and
19 | employees, attendance at management and board of directors'
20 | meetings and committees thereof, and via reports and other
21 | information provided to him in connection therewith.

22 | 21. Defendant Rushton O. Backer ("Baker") was, at all
23 | relevant times, a director of the Company. Because of Backer's
24 | position with the Company, he had access to the adverse non-public
25 | information about its business, finances, products, markets and
26 | present and future business prospects, via access to internal
27 | corporate documents (including the company's operating plans,
28 | budgets and forecasts and reports of actual operations compared

- 9 -

thereto), conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

22. Defendant Marne Obernauer, Sr. ("Obernauer") was, at all relevant times, a director of the Company. Because of Obernauer's position with the Company, he had access to the adverse non-public information about its business, finances, products, markets and present and future business prospects, via access to internal corporate documents (including the company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith.

23. At all times material hereto, each of the individual defendants was the agent of the Company, and at all times acted within the course and scope of said agency. By reason of their stock ownership, management positions and/or membership on the Company's Board of Directors, the individual defendants were controlling persons of the Company and had the power and influence, and exercised the same, to cause the Company to engage in the illegal practices complained of herein. They are thus liable as controlling persons.

24. As officers, directors and/or controlling persons of a publicly-held company whose stock is registered with the SEC under the Exchange Act and traded on the NASDAQ National Market System, the defendants had a duty to promptly disseminate accurate and

1   truthful information with respect to the Company's operations,

2   business, products, markets, management, earnings, present and

3   future business prospects, to correct any previously issued

4   statements that had become untrue and to disclose any adverse

5   trends that would materially affect the present and future

6   financial operating results of the Company, so that the market

7   price of the Company's stock would be based upon truthful and

8   accurate information.

9       25.  The defendants, because of their positions with the

10  Company, controlled and/or possessed the power and authority to

11  control the contents of its quarterly and annual reports, press

12  releases and presentations to securities analysts and thereby the

13  investing public.  Each defendant was provided with copies of the

14  Company's reports and press releases alleged herein to be

15  misleading prior to or shortly after their issuance and had the

16  ability and opportunity to prevent their issuance or cause them to

17  be corrected.  Because of their positions and access to material

18  non-public information available to them but not to the public,

19  each of these defendants knew or recklessly disregarded that the

20  adverse facts specified herein had not been disclosed to and were

21  being concealed from the public and that the positive

22  representations which were being made were then false and

23  misleading.  As a result, each of the defendants is responsible for

24  the accuracy of the public reports and releases detailed herein as

25  "group published" information and is therefore responsible and

26  liable for the representations contained therein.

27

28

1  <u>HAMLET'S INTERNAL FORECASTS, PLANS AND PROJECTIONS</u>

2       26.   A key management tool for the Company's top executives
3  was its business plan, budget, forecast and/or projection, by which
4  the Company's top executives set performance goals for Hamlet and
5  then closely monitored the corporation's actual performance, <u>i</u>.<u>e</u>.,
6  results of operations compared to the planned, budgeted and/or
7  forecasted results, on a continuing basis.   These plans, forecasts
8  and budgets were prepared on an annual basis and updated during the
9  year.   Each of the defendants was aware of Hamlet's internal plan,
10  forecast and budget and of the internal reports prepared and
11  circulated, at least monthly, comparing Hamlet's actual results to
12  those previously planned, budgeted and/or forecasted including,
13  specifically, the status of the planned unit expansion.   Hamlet top
14  executives used its internal plan, budget and forecast as the basis
15  for the statements they made publicly about the Company's
16  performance during the Class Period.   Based on the negative
17  internal reports of the Company's actual business performance
18  compared to that planned, budgeted and forecasted, including the
19  inability of operations to generate the necessary cash flow to meet
20  the business plan, the defendants knew or recklessly disregarded
21  that those public statements, and the statements by securities
22  analysts for which the Company is responsible, were false and
23  misleading when made and were inflating the market price of Hamlet
24  stock.

25                    FRAUD-ON-THE-MARKET DOCTRINE

26       27.   The market for Hamlet stock is an efficient market for
27  the following reasons, among others:

28

1              (a)   Hamlet stock met the requirements for listing, and

2     was  listed,  on  the  NASDAQ  National  Market  System,  a  highly

3     efficient and automated market;

4              (b)   As a regulated issuer, the Company filed periodic

5     public reports with the SEC;

6              (c)   The  Company's  trading  volume  in  its  stock  was

7     substantial, reflecting numerous trades each day; and

8              (d)   The  Company  was  followed  by  analysts  employed  by

9     brokerage  firms  who  wrote  reports  which  were  distributed  to  the

10    sales  force  and  certain  customers  of  their  respective  brokerage

11    firms  and  which  were  available  to  the  public.    Each  of  these

12    reports was publicly available and entered the public marketplace.

13                        CONSPIRACY, AIDING AND ABETTING AND
                            CONCERTED ACTION ALLEGATIONS

14

15         28.   Each of the defendants is liable as a direct participant

16    in, an aider and abettor of, and a co-conspirator with respect to

17    the wrongs complained of herein.  In committing the wrongful acts

18    alleged herein, all of the defendants pursued a common course of

19    conduct and conspired with one another in furtherance of their

20    common plan and scheme.  The conspiracy was designed to and did,

21    (i) deceive the investing public, including plaintiff and the other

22    Class Members, regarding Hamlet's expansion capabilities, demand

23    for  its  products,  financial  condition  and  present  and  future

24    business prospects; (ii) artificially inflate the market price of

25    Hamlet common stock during the Class Period to the benefit of the

26    Hamlet defendants; (iii) cause plaintiff and other members of the

27    Class to purchase Hamlet common stock at inflated prices; and (iv)

28    permit  certain  defendants  to  sell  their  Hamlet  common  stock  at

                                  - 13 -

1  inflated prices.    In furtherance of this plan, conspiracy and
2  course of conduct, defendants, and each of them, took the actions
3  alleged herein.

4      29.  Defendants' conspiracy commenced by at least the
5  beginning of the Class Period.    The Hamlet defendants falsely
6  presented the Company's current and future business prospects and
7  prolonged the illusion of revenue and earnings growth by making it
8  appear that its existing and new units were successful, that it was
9  successfully countering price competition, and that it could main-
10  tain its announced unit growth and development plans.    The
11  defendants engaged in such a scheme so that they could inflate the
12  price of the Company's stock in order to, inter alia: (i) protect
13  and enhance their executive positions and the substantial
14  compensation benefits and prestige they obtained thereby; (ii)
15  enhance the value of their personal holdings and options in Hamlet
16  and indirectly gain additional benefits; (iii) sell shares of
17  Hamlet common stock they owned at inflated prices to obtain large
18  amounts of cash and large profits and/or avoid significant losses;
19  (iv) inflate the reported profits of the Company in order to obtain
20  larger payments under Hamlet's officer bonus compensation plan
21  and/or via discretionary individual performance bonuses; and (v)
22  cover up the individual defendants' prior mismanagement of Hamlet.

23      30.  Each of the defendants aided and abetted and rendered
24  substantial assistance in the wrongs complained of.    In taking the
25  actions, as particularized herein, to substantially assist the
26  fraud, each of the defendants acted with knowledge of the primary
27  wrongdoing, substantially assisted the accomplishment of that fraud

28

- 14 -

1    and was aware of his overall contribution to and furtherance of the

2    fraud.

3                        HAMLET'S GUIDANCE TO AND USE OF
                   SECURITIES ANALYSTS AS A CONDUIT TO FEED FALSE
4                    INFORMATION TO THE SECURITIES MARKETS

5         31.   Analysts employed by securities firms prepare written

6    reports and make recommendations from time to time about public

7    companies such as Hamlet.  In writing their reports, these analysts

8    rely  in  substantial  part  upon  information  provided  by  and

9    statements and reports made publicly by the company, information

10   provided to them privately by the company, and assurances by the

11   company  that  information  in  the  analysts'  reports  is  not  at

12   material variance from the company's internal knowledge of its

13   operations and prospects.

14        32.   Because Hamlet stock was a "growth stock," its price was

15   particularly sensitive to the Company's and analysts' statements

16   regarding the Company's future profits.   Defendants used their

17   communications to analysts to assure them that Hamlet's business

18   was strong, that the Company was on schedule to achieve consistent

19   growth in net income and earnings per share throughout 1993-1994,

20   and, importantly, that growth and development plans announced by

21   the  Company  were  "on-track"  pursuant  to  a  well-thought-out,

22   comprehensive strategy, and that this key indicium of Hamlet's

23   health remained undisturbed by interim events.

24        33.   Hamlet  is  followed  by  specific  securities  analysts

25   employed  by  brokerage  houses  which  issue  reports  or  make

26   recommendations concerning Hamlet securities to their clients.

27   Among the securities firms that followed the Company during the

28

1    Class Period were Dean Witter Reynolds and L.H. Friend, Weinress &
2    Frankson, Inc.

3         34.   Prior to and during the Class Period, it was the
4    Company's practice to have its top officers and key members of
5    Hamlet's management team communicate regularly with securities
6    analysts including analysts at the firms whose reports have been
7    identified above on a regular basis to discuss, among other things,
8    the Company's prospects, its products, operating results, and
9    anticipated performance, and to provide detailed "guidance" to
10   these analysts with respect to the Company's business, including
11   projected revenues, earnings and, of particular importance to
12   Hamlet analysts, expansion plans.  These communications included,
13   but were not limited to, frequent conference calls, meetings and
14   analyst briefings where the defendants or their agents at their
15   direction and with their acquiescence discussed aspects of the
16   Company's operations and financial prospects.  The defendants knew
17   that by participating in and/or approving these periodic
18   communications with analysts, the Company could disseminate
19   information to the investment community which investors would rely
20   and act upon (i.e., make purchases and sales of the Company's
21   securities).   The defendants had and/or orchestrated these
22   communications with analysts in order to cause or encourage them to
23   issue favorable reports on Hamlet and used these communications to
24   falsely present the successful prospects of Hamlet to the
25   marketplace, as particularized herein, to artificially inflate the
26   market price of Hamlet common stock and to permit the public
27   offerings of the Common Stock.

28

35. The information about Hamlet contained in the various securities analysts' reports, quoted herein, was obtained from or based on information obtained from Hamlet, as discussed above, and copies of drafts of these reports were provided to the Hamlet defendants and Hamlet top officers for review and approval or response by them. Hamlet knew of these reports, their contents, that they were based on information provided by Hamlet, and that they would be issued to members of the investing public, be circulated throughout the investment community, impact the trading price of Hamlet common stock, and help permit the public offerings of the Common Stock. Hamlet endorsed the contents of these reports, adopted them as its own and placed its imprimatur on them as well as on the projections, forecasts and statements contained therein. Despite their duty to do so, the defendants failed to correct these statements during the Class Period.

36. The investment community, and in turn, investors, relied and acted upon the information communicated in these written reports that recommended that investors purchase Hamlet common stock based upon, the representations of well planned, ambitious unit growth and indications of excellent Company performance communicated thereby. The defendants manipulated and inflated the market price of Hamlet stock in this manner by falsely presenting to analysts, through regular meetings and during both telephonic and written communications, the prospects of the Company and by failing to disclose the true adverse information about the Company that was known only to them.

CLASS ACTION ALLEGATIONS

37.  Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. The Class is defined as all persons who purchased or otherwise acquired the common stock of Hamlet, Inc. from November 21, 1991 through April 1, 1993, inclusive, and who sustained damage as a result of such purchases.  Excluded from the Class are the defendants herein, members of their immediate families and any subsidiary, affiliate or controlled person of any such person or entity.

38.  There are hundreds of holders of the Company's common stock and, as of November 1993, approximately 4 million shares of common stock were outstanding.  The stock is actively traded in an efficient market on the NASDAQ National Market System.  The Class is so numerous that joinder of all members is impracticable.

39.  Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class sustained damages arising out of defendants' conduct complained of herein in violation of federal law.

40.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests which are contrary to or in conflict with those of the Class members he seeks to represent.

41.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be

1  relatively small, the expense and burden of individual litigation
2  make it impossible for the members of the Class individually to
3  redress the wrongs done to them. There will be no difficulty in
4  the management of this action as a class action.

5  42.  Common questions of law and fact exist as to all members
6  of the Class and predominate over any questions affecting solely
7  individual members of the Class. Among the questions of law and
8  fact common to the Class are:

9  (a)  Whether the Securities Exchange Act was violated by
10  defendants' acts as alleged herein;

11  (b)  Whether defendants participated in, pursued, or
12  aided and abetted the concerted action or common course of conduct
13  complained of;

14  (c)  Whether the Company's reports to the SEC on Forms
15  10-K and 10-Q, its reports to shareholders, its Registration
16  Statement filed with the SEC and its other publicly filed and
17  disseminated documents and other statements during the Class Period
18  omitted and/or misrepresented material facts about the business and
19  finances of the Company or otherwise failed to comply with the
20  reporting requirements of the SEC;

21  (d)  Whether the defendants acted willfully, knowingly or
22  recklessly in omitting and/or misrepresenting these material facts,
23  or in conspiring to make or aiding and abetting the making of such
24  misstatements;

25  (e)  Whether the market price of Hamlet stock during the
26  Class Period was artificially inflated due to the conduct of
27  defendants complained of herein, including the alleged non-
28  disclosures and/or misrepresentations; and

- 19 -

1        (f)   Whether the members of the Class have sustained

2  damages, and, if so, the proper measure of such damages.

3      43.  Plaintiff knows of no difficulty that will be encountered

4  in the management of this litigation that would preclude its

5  maintenance as a class action.

6      44.  The names and addresses of the record owners of Hamlet

7  common stock purchased, or otherwise acquired, during the Class

8  Period are available from Hamlet's transfer agent.  Notice can be

9  provided to such record owners via first class mail using

10  techniques and a form of notice similar to those employed in class

11  actions arising under the federal securities laws.

12                 SUMMARY OF THE TORTIOUS CONDUCT

13      45.  Prior to 1988, Hamlet had been a public company.

14  However, in May 1988 an investor group including defendant McFall

15  took the Company private via a leveraged buy-out ("LBO") whereby

16  the Company incurred almost $30 million in debt along with other

17  financial obligations.  In part because of the substantial interest

18  payments which had to be made every month to service this debt,

19  Hamburger Hamlet incurred a net loss for the fiscal years ended

20  December 31, 1989 and December 30, 1990, and the thirty-nine weeks

21  ended September 30, 1990 and September 29, 1991.

22      46.  This was an intolerable situation for the insiders,

23  including the individual defendants.  To make matters worse, the

24  lenders who had financed the LBO were calling their debt, and the

25  tight credit market made alternative funding difficult to obtain.

26  The only course available to the insiders was to once again take

27  the Company public -- a move which has been described as "a classic

28  step out of the LBO Survival Manual."

47.  The problems which defendants faced in attempting to market an initial public offering ("IPO") were severalfold, including:

(a)  The proceeds would be used to pay off the LBO debt, and would therefore not be available to grow the business. Investors would be reluctant to have IPO funds used simply to fund a bailout.

(b)  The Company had lost money in the prior two fiscal years as well as in the first three quarters of each of those fiscal years.

(c)  Certain members of the investment group were using the IPO as a means to sell some of their personal holdings in the Company, which would be a red flag for investors.

(d)  1991 was a year during which many restaurant public offerings were made; so Hamlet would be just one of many with little to distinguish it.

48.  To overcome these problems, defendants falsely represented to the investing public that:

(a)  once the LBO debt was retired, the Company could and would be profitable and would steadily expand and continue to open new restaurants using internally-generated funds because

(i)  all significant restaurant maintenance and renovations had been completed and would not result in additional expenses;

(ii)  recently-opened restaurants were providing substantially greater sales and earnings than had been expected, and that, because of well researched planning, future restaurants would do the same; and

- 21 -

1              (iii) general and administrative expenses had been

2  trimmed, were well under control, and could be cut even more as the

3  organization grew, such that they would continue to decrease as a

4  percentage of increasing revenue;

5              (b) the Company's Chairman and CEO was in for the long

6  haul, would not sell his stock, but, on the contrary, would

7  purchase more stock because of his faith in the Company's future

8  success and, moreover, the insiders' stock would be subject to a

9  "lock-up" whereby no sales would be permitted for at least 270

10  days; and

11              (c) Hamburger Hamlet offered a unique, well-established

12  restaurant concept, which had recently been freshened to keep pace

13  with the times, as determined and verified by continuous customer

14  feedback.

15      As is more fully alleged below, defendants made these

16  statements knowing or recklessly disregarding that they were false

17  and misleading.

18      49.  Thereafter, to increase and maintain the price of its

19  stock during the Class Period, Hamburger Hamlet needed to show (a)

20  consistent revenue growth, (b) consistent earnings growth, and (c)

21  continued justification for a high price/earnings ratio.  Revenue

22  growth was achieved through expansion of the chain via new-store

23  openings, which, defendants knew, could not be maintained.

24  Earnings growth was achieved by, _inter alia_, improperly

25  capitalizing pre-opening costs; postponing maintenance, upgrades,

26  and remodeling of older restaurants; failing to write off a

27  $500,000 receivable which defendants knew was uncollectible;

28  failing to reserve for a lease guarantee obligation which

1  defendants knew would be triggered; and postponing necessary
2  marketing and promotional expenses. Justification for a high
3  price/earnings ratio was provided by defendants' false
4  representations that their restaurant expansion program was well
5  planned and highly successful, and that they could and would
6  continue to open new restaurants using internally-generated funds.

7     50.  Defendants' scheme was successful. Hamburger Hamlet went
8  public on November 21, 1991 (the beginning of the Class Period),
9  with the Company and two principal shareholders selling 2,572,525
10  shares of common stock at $11.50 per share, for total proceeds of
11  almost $30 million. Shortly thereafter, the stock price climbed to
12  $18 per share, fell back to approximately the offering price, then
13  climbed again to over $20 per share. However, as the true
14  condition of the Company's business, internal problems, and future
15  prospects became known, the price of Hamburger Hamlet stock fell to
16  below $10 per share, and now sells for approximately one-half the
17  offering price.

18  <div align="center">THE FALSE AND MISLEADING STATEMENTS</div>

19     51.  On November 21, 1991, the Registration Statement and
20  Prospectus for the Hamlet initial public offering, signed by
21  defendants McFall, Brockman, Obernauer, Levie, and Backer, became
22  effective.  The Prospectus stated:

23       The Company attempts to differentiate itself from
24       Competitors through <u>operational excellence</u>, <u>speed of</u>
25       <u>service</u> and convenient locations.  The Company believes
26       that the quality of its food preparation, service and
27       amenities are critical to its success, and have been
28       significantly enhanced by the <u>close control afforded by</u>

<div align="center">- 23 -</div>

1    the company's ownership and operation of each of its
2    restaurants. . . .
3    . . . As part of management's [1988-1991] strategy, the
4    Company divested non-restaurant real estate and sold two
5    less profitable restaurants not operated under the
6    Hamburger Hamlet name. . . .  In addition, the Company
7    directed its resources toward enhancing the performance
8    and image of its restaurants by refocusing on the
9    Hamburger Hamlet concept, modernizing systems and
10   operations, standardizing the menu, remodeling selected
11   restaurants, and developing new restaurants.
12       Having completed the sale of all non-essential real
13   estate and having streamlined its operations, the
14   Company's strategy is to continue to expand within, and
15   contiguous to, its existing markets.   Management
16   anticipates opening at least five new restaurants during
17   the next twelve months.   In addition, the Company has
18   identified certain potential future sites and, subject to
19   market conditions and other factors, the Company's
20   strategy is to open at least four restaurants per year
21   thereafter for the foreseeable future.

22                           *   *   *

23       The Company relies primarily upon repeat customers
24   and attracts new customers through word-of-mouth, use of
25   radio and print advertising, billboards, and
26   participation in cooperative advertising with vendors.
27   In addition, the Company engages in a variety of
28   promotional activities.

- 24 -

* * *

The Company also <u>uses customer evaluations</u> and a "mystery customer" quality control program to independently monitor customer satisfaction.

* * *

. . . Existing restaurant leases have expirations ranging from 1993 through 2011 (excluding existing renewal options), with all but three leases having a remaining term of at least four years (including existing renewal options). <u>The Company does not anticipate any difficul-ties renewing its existing leases as they expire</u>. . . .

52. On January 9, 1992 defendant McFall was quoted in <u>The Los Angeles Times</u> as saying that he intended to add to his stake in Hamlet stock, thereby implying that he had no intention to sell shares. This statement was false and misleading, because, in fact, defendant McFall had no intention of purchasing additional shares of Hamlet stock, but rather planned to sell tens of thousands of shares of his stock immediately upon expiration of the 270-day "lock-up" period following the IPO.

53. On March 3, 1992, the Company issued a press release announcing its fourth quarter and fiscal year end earnings ended December 29, 1991. In the release, defendant McFall was quoted as saying:

We are well positioned to realize our growth and profit potential.

<u>Our new stores are all ahead of budget</u> and we are very excited about their prospects.

1    I look forward to our management team continuing to

2   meet the company's objectives for growth. . . .  <u>We are</u>

3   <u>truly well positioned for significant controlled growth</u>

4   in the coming years.

5   54.  On or about March 25, 1992, the Company distributed its

6 1991 Annual Report to Shareholders.  In a letter signed by

7 defendants McFall and Brockman, the Company represented:

8    1991 was an extremely busy, transitional year in the

9   41-year history of Hamburger Hamlet Restaurants, one that

10   created a strong foundation for <u>what promises to be a</u>

11   <u>very positive future for your company</u>.

12         * * *

13   [W]e are well positioned for a secure, auspicious

14   financial future.

15         * * *

16   <u>The Managed Growth Plan</u>

17         * * *

18   A great deal of time and effort was spent

19   establishing architectural design standards which we are

20   implementing throughout our expansion. . . .  This look,

21   <u>now established</u>, can be easily duplicated at an efficient

22   cost in all new locations.

23         * * *

24   <u>Three New Stores Opened</u>

25    In April, we opened a beautiful new location in

26   Agoura Hills, California.  In October, we opened a

27   Hamburger Hamlet in Arlington, Virginia.  Gaithersburg,

28

1    Maryland was the site for our third new store, opened in
2    December.

3        When we opened the doors more than 600 enthusiastic
4    guests streamed in at each location.  <u>Sales have exceeded</u>
5    <u>our expectations, and we are optimistic that the positive</u>
6    <u>results will continue</u>.

7    <u>The Tradition of Hamburger Hamlet</u>

8        We recognize that the stability and consistency of
9    the Hamburger Hamlet restaurant is the mainstay of our
10   success.  <u>Our stable core of stores are very predictable</u>
11   <u>in terms of profit, which we feel can be maintained even</u>
12   <u>in these times of general economic recession</u>.

13       We firmly believe we can build on the financial
14   reliability and proven profit history of the Hamburger
15   Hamlet restaurant to increase shareholder value.   Our
16   strategy is to increase sales and profits through the
17   addition of new restaurants.  <u>We expect to open at least</u>
18   <u>five new stores in 1992 and hope to add five or more per</u>
19   <u>year thereafter</u>.

20   Later in the Annual Report, the Company made the following
21   representations:

22       <u>Updating Existing Locations</u>

23       <u>We are committed to maintaining the highest interior</u>
24   <u>standards in all our restaurants</u>.  Since so many of our
25   very welcomed and appreciated guests are "regulars" at
26   their neighborhood Hamlets, we pamper them with the
27   utmost in comfort and attractiveness - always.

28                               *   *   *

1    <u>Liquidity and Capital Resources</u>

2    Management believes that the reduction of debt and

3    resultant increase in cash flow <u>will enable the Company</u>

4    <u>to finance the development and opening of additional</u>

5    <u>restaurants</u>.

6    55.   On March 25, 1992, Dean Witter Reynolds issued a report,

7    written by D.J. Adelman, on Hamburger Hamlet.  That report, which

8    was written in consultation with and with the approval of

9    defendants McFall and Brockman, estimated <u>1992 earnings per share</u>

10   <u>of $0.80 and 1993 EPS of $1.00</u>, and, stated the following:

11   <u>EPS are projected to grow at a 20% compound annual</u>

12   <u>rate from 1992-1995</u>.  Earnings and revenue growth will be

13   driven primarily by new unit expansion.  We estimate that

14   the company will open four units in both 1992 and 1993.

15   We consider these estimates conservative, and we

16   anticipate that over time the company should be able to

17   open six units per year that can be financed internally

18   out of cash flow. . . .  <u>Total revenue is forecasted to</u>

19   <u>grow at a 16% compound annual rate, and we estimate that</u>

20   <u>sales will reach $100 million by 1995</u>. . . .

21   . . . <u>Earnings per share are forecasted to grow [at] a</u>

22   <u>20% compound annual rate</u>, somewhat more slowly than the

23   projected rate of pretax income growth, due to the

24   issuance of new shares in the firm's initial public

25   offering.

26   <u>Strong free cash flow will enable faster expansion</u>.

27

28

- 28 -

56.  On April 30, 1992, the Company issued a press release announcing a new restaurant opening.  In the release, defendant Brockman is quoted as saying:

All of our new restaurants are exceeding their projected revenues, . . . and we anticipate the Northridge, California store will meet or exceed its projections.

The Company's plan for growth and expansion is working. . . .

57.  On May 8, 1992, Dean Witter Reynolds issued a research report on Hamburger Hamlet, written by D.J. Adelman.  That report, which was drafted in consultation with and with the approval of defendants McFall and Brockman, stated the following:

Hamlet is currently trading at 18.4 times our 1992 EPS estimate of $0.80, which places it at a modest discount to the other full-service restaurant stocks we monitor. Our twelve-month target price is $18.

*   *   *

The leveraging of general and administrative costs over the next several years is one of the key reasons we anticipate that earnings can grow significantly more rapidly than sales.

*   *   *

We continue to forecast four new restaurant openings in 1992; EPS of $0.80.  For the full 1992 year, we continue to forecast that four new Hamburger Hamlets will open, and that the company will achieve aggregate sales of $65 million.  We believe that the company will achieve

- 29 -

1   an <u>increase in same-store sales in the range of 1-2%</u>, an

2   <u>operating profit margin of 8.5%, net income of $3.2</u>

3   <u>million, and earnings per share of $0.80.   Our 1993</u>

4   <u>earnings per share forecast also remains unchanged at $1</u>.

5   58.   On or about May 11, 1992, the Company published its Form

6   10-Q, signed by defendant Brockman, for the quarter ending March

7   29, 1992.   The following statements were made in that report:

8   Net income for the three months ended March 29, 1992

9   increased to $654,000, or $0.16 per share compared to a

10   net loss of ($285,000), or ($0.15) per share for the

11   three months ended March 31, 1991.

12   *   *   *

13   The   Company   anticipates   that   its   capital .

14   expenditures program for expansion will be funded from

15   internal operations, building to suit lease agreements

16   with landlords, equipment leasing packages and borrowings

17   under   its   existing   $6   million   aggregate   credit

18   facilities.   <u>Management   believes   that   there   are</u>

19   <u>sufficient funds available from these sources to fund its</u>

20   <u>existing expansion plans</u>.

21   59.   On or about May 26, 1992, the Company issued its First

22   Quarter Report to Shareholders.   In a letter signed by defendants

23   McFall and Brockman, the Company stated:

24   We opened a beautiful new restaurant in Northridge,

25   California in April.   Keeping in line with <u>our rapid</u>

26   <u>growth and expansion strategy</u>, four additional locations

27   will be opened throughout the remainder of the· year.

28   These additions will bring our total number of operating

- 30 -

1   restaurants to 31 by year end, _further increasing our_

2   _profit base_.

3                              *   *   *

4        The _Company is well positioned to report positive_

5   _results throughout 1992_, and we are confident that our

6   long-term view is secure.

7        Hamburger Hamlet's many attributes remain as our

8   strong foundation – the support of our guests, _beautiful_

9   _restaurants_, superb food quality, enticing new products,

10   and the talent and professionalism of our staff.

11        60.  On July 15, 1992, the Company issued a press release

12   announcing record sales at its newest restaurant.  In the release,

13   defendant McFall is quoted as saying:

14        _All of the new locations have exceeded their projected_

15   _revenues_, and we anticipate that the restaurants will

16   continue to perform strongly.  _We fully expect to_

17   _continue increasing our profit base as each new location_

18   _is opened_.

19        61.  On July 21, 1992, L.H. Friend, Weinress & Frankson, Inc.,

20   published a securities analyst report written by S.D. Weinress.

21   That report, which was written in consultation with and with the

22   approval of defendants McFall and Brockman, estimated _1992 earnings_

23   _per share of $0.80, 1993 EPS of $1.10 and_ stated the following:

24        RECOMMENDATION: BUY

25                              *   *   *

26        Management, after acquiring [Hamburger Hamlet] in an

27   LBO (May of 1988), _revitalized the company through_

28   _remodeling existing units, instituting a focused_

- 31 -

1    expansion program, and putting in place controls
2    capable of operating a considerably larger restaurant
3    chain. . . . Our conservative expectation projects a 25%
4    annual earnings growth the next three to five years.
5    This growth merits a higher valuation in the marketplace.
6        62.  On August 3, 1992, the Company issued a press release
7    announcing second quarter earnings.  The press release reported:

8        Net income for the six months ended June 28, 1992,
9    was $1.36 million or $0.33 per share.  This compares with
10   a net loss of ($363,000) or ($0.19) per share for the
11   prior comparable period in 1991.

12                            *  *  *

13       "[We are] pleased with our second quarter results,"
14   said Thomas A. McFall, chairman and chief executive
15   officer . . . .  "We reported strong increases in both
16   net income and income from operations, and our new store
17   revenues continue to be strong."

18       63.  On or about August 10, 1992, the Company filed its Form
19   10-Q for the quarter ending June 28, 1992.  In that report, signed
20   by defendant Brockman, the Company stated:

21       The Company anticipates that its capital
22   expenditures program for expansion will be funded from
23   internal operations, funding provided by build-to-suit
24   leases, equipment leasing packages and borrowings under
25   its existing $6 million aggregate credit facilities.
26   Management believes that there are sufficient funds
27   available from these sources to fund the Company's
28   existing expansion plans.

64. On or about August 31, 1992, the Company issued its Second Quarter Report to Shareholders. In a letter signed by defendants McFall and Brockman, the Company made the following statements:

> The second quarter of fiscal 1992 was a quarter of accomplishment for Hamburger Hamlet Restaurants, Inc. Even in the light of a general economic recession, and the riots in Los Angeles, our company reported strong increases in net income, income from operations, and total revenues. <u>Achieving these positive results under difficult circumstances confirms the consistency and prosperity of our organization.</u>
>
> <div align="center">* * *</div>
>
> Our Valencia, California Hamburger Hamlet opened June 9 to a record setting number of guests. <u>It has been the most successful opening in our history</u>. . . .
>
> Wheaton, Illinois marked the site for the third Hamburger Hamlet opened in 1992 on August 4. . . . We are enthusiastic about the Wheaton store, <u>as initial guest attendance is far exceeding our expectations.</u>
>
> <div align="center">* * *</div>
>
> We are pleased with our results during the first half of 1992 and <u>anticipate even greater success for the remainder of the year</u>.
>
> As we go forward, we will continue to execute our growth and expansion plan as <u>our strategy is working</u>. The addition of new restaurants favorably impacts our

1    earnings, while <u>our core of existing stores remain</u>
2    <u>profitable and consistent</u>.

3         We are targeting the addition of at least six new
4    stores in 1993, and each year thereafter.

5         65.  On October 23, 1992, defendant McFall was quoted in the
6    <u>PR Newswire</u> as saying, in connection with the third quarter
7    earnings announcement, "These extremely positive third-quarter
8    results <u>further prove that our growth and expansion plans are</u>
9    <u>working</u>."

10        66.  On or about November 9, 1992, the Company filed its Form
11   10-Q for the quarter ending September 27, 1992.  This Form, signed
12   by defendant Brockman, stated the following:

13        Income from operations for the three months ended
14        September 27, 1992 increased 75.2% to $1.45 million from
15        $830,000 for the three months ended September 29, 1991.
16        The increase was due primarily to the addition of
17        revenues from five new restaurants opened since September
18        29, 1991 <u>and changes in the relationships between</u>
19        <u>revenues and expenses discussed above</u>.

20                          *   *   *

21        The Company anticipates that its capital
22        expenditures program for expansion will be funded from
23        internal operations, funding provided by build-to-suit
24        leases, equipment leasing packages and borrowings under
25        its existing $7.5 million aggregate credit facilities.
26        <u>Management believes that there are sufficient funds</u>
27        <u>available from these sources to fund the Company's</u>
28        <u>existing expansion plans</u>.

- 34 -

67.  On or about November 30, 1992, the Company distributed its Third Quarter Report to Shareholders.  In a letter signed by defendants McFall and Brockman, the Company stated:

> We are very pleased with the performance of our new restaurants, and <u>remain confident that their positive impact will continue</u>.

> <u>Lease negotiations are progressing very well</u> on a variety of high quality locations in all of our markets. We plan to open at least 6 of these superior locations during 1993.

68.  On January 25, 1993, an interview with defendant McFall was published in <u>The Wall Street Transcript</u>.  In that interview, defendant McFall was quoted as saying:

> <u>I see us going from 30 stores to 60 stores over the next four to five years</u>.  We have the systems, the people and places to do it.

> [T]he real growth story of Hamburger Hamlet is the opening of new stores.  We are primed for expansion. <u>We've built our overhead, we've built our control systems and have spent money to open 100 additional stores</u>.

>                         *   *   *

> When we first restructured ourselves four years ago, <u>we spent a lot of money on capital expenditures to improve the underlying company</u>.  Now we're in a maintenance mode, and if anything, <u>I see a decrease in our capital expenditures</u>.

>                         *   *   *

1           We believe our stock is an extraordinary bargain. . . .

2           Our efforts have certainly been productive and hopefully

3           some day people will realize that we shouldn't be at the

4           low end, and we should be at the high end.

5                                    *   *   *

6           I think one of the things that is very much overlooked is

7           that our general and administrative expenses are fixed.

8           We've already spent the money on infrastructure, we've

9           already hired the management, we've already got ourselves

10          poised for growth.

11                                   *   *   *

12          We want to continue to deliver a predictable, strong

13          earnings base without giving our investors a tremendous

14          amount of risk. . . .  I think you need to look at the

15          predictability   of   earnings,   and   ours   are   very

16          predictable.

17          69.  On February 22, 1993, the Company issued a press release

18     announcing somewhat disappointing 1992 fourth quarter earnings.

19     Nonetheless, the press release stated:

20          "Overall, 1992 was an excellent year for Hamburger

21          Hamlet   Restaurants,   Inc.,"   said   Thomas   A.   McFall,

22          chairman   and   chief   executive   officer.    "We   achieved

23          dramatically   improved   sales   and   operating   profits

24          compared   to   the   previous   year."    "Additionally,   we

25          successfully   opened   five   new   Hamburger   Hamlets,   as

26          planned, each of which has proven very successful in

27          contributing to our improved results." "In reviewing the

28          year, we are pleased that same-store revenues remained as

                                    - 36 -

1   strong as they did in view of the prevailing difficult
2   economic environment."

3   "1992 was a year of growth, accomplishment and
4   learning for Hamburger Hamlet Restaurants, Inc.," said
5   McFall.  "We have learned a great deal from the year, and
6   more importantly, we have proven we can respond to, and
7   manage the challenges that face all companies in the
8   1990s."

9   "We believe that the positive momentum built up in
10  1992 will continue into 1993," said McFall.  "We are
11  optimistic that the ability to obtain beneficial lease
12  terms will remain, presenting us with a wide variety of
13  exciting locations to choose from."  "We plan to open at
14  least six new restaurants in 1993."

15  In explanation of the disappointing fourth quarter results, the
16  press release stated:

17  "In the fourth quarter, historically not our strongest
18  quarter, we felt the effects of Southern California's
19  soft economy, which led to the slight decrease in same
20  store revenues during the quarter," said McFall.   In
21  addition, our margins came under pressure during the
22  fourth quarter for the first time in the past twelve
23  months. . . .

24  "Once again, our general and administrative costs as a
25  percentage of revenues continued to decrease during the
26  quarter," McFall continued.  This further validates our
27  ability to grow while continuing to manage our general
28  and administrative expenses.

- 37 -

70.   On February 25, 1993, Dean Witter Reynolds issued an analyst report written by D.J. Adelman.   That report, which was written in consultation with and with the approval of defendants McFall and Brockman, stated the following:

> Although [fourth quarter] results were below our expectations, we note that Hamburger Hamlet continues to outperform its competitor on a same-store sales basis in the California market.  We anticipate that the Company's near-term earnings prospects will remain a function of new-store performance, as we estimate that same-store profits during fourth-quarter 1992 declined approximately $200,000.  **The Company plans to open six new Hamburger Hamlets during 1993.**
>
> *  *  *
>
> We continue to forecast six new restaurant openings in 1993 and **earnings per share of $0.90.**  For the full 1993 year, we continue to forecast that six new Hamburger Hamlets will open, and that the **company will achieve aggregate sales of $75 million.**  We believe that the company will have flat same-store sales, an operating profit margin of 8.5%, **net income of $3.7 million and earnings per share of $0.90.**  Our estimates do not assume a meaningful recovery in the California economy.

71.   On or about March 22, 1993, the Company filed its Form 10-K with the SEC for the fiscal year ended December 27, 1992. That report, signed by defendants McFall, Brockman, Backer, Levie, and Obernauer, stated:

The opening of these [five] new restaurants [in 1992] resulted in the desired effect of increasing the Company's revenues and decreasing expense as a percentage of revenue.

* * *

The Company intends to continue its strategy of adding restaurants through controlled growth into existing markets and into areas contiguous to its existing markets.  The Company anticipates opening at least six new restaurants during the next twelve months.

72.  On or about March 26, 1993, the Company distributed its 1992 Annual Report to Shareholders.  In a letter signed by defendants McFall and Brockman, the Company stated:

These increases [in revenues, income from operations, and net income] were attributed to revenues from eight new restaurants opened over the past two years.  We are enthusiastic that our plan to increase profits and maximize shareholder value through unit expansion is working.

* * *

Remodeling our existing restaurants is always a priority, as we are dedicated to presenting a fresh, modern look for our welcomed guests throughout all of our locations.

* * *

Lease negotiations are progressing very well on a variety of high quality locations.  We plan to open in at

1    least six of these superior sites during 1993 and each
2    year thereafter.

3                              *  *  *

4         In November of 1991, we became a public company.  We
5    thank our shareholders for giving us the capital needed
6    to accomplish our ambitious expansion program.  By adding
7    new restaurants and maximizing our profits at existing
8    restaurants, <u>we believe we will continue steady and</u>
9    <u>strategic growth well into our future</u>.

10   Later in the Annual Report, the Company stated that "[t]he Hamlet
11   menu features <u>more than 130 delectable dishes</u>," that "[o]ur
12   restaurants look and feel more like a private club than a
13   restaurant," and that "[a]ll locations follow the Hamlet design
14   standards . . . ."  Under the heading "Liquidity and Capital
15   Resources," the Company stated:

16        The Company anticipates that its capital expenditures
17        program for future expansion will be funded from internal
18        operations, funding provided by build-to-suit leases,
19        equipment leasing packages and borrowings under its
20        existing $3.5 million line of credit facility.
21        <u>Management believes that there are sufficient funds</u>
22        <u>available from these sources to cover the Company's cash</u>
23        <u>requirements</u>.

24        73.  The foregoing representations made during the Class
25   Period were each false and misleading when made in that they
26   concealed and failed to disclose, <u>inter alia</u>, the following adverse
27   information concerning the Company and its business, disclosure of
28   which was necessary to make the statements made not misleading, and

which information was known to defendants from internal Hamlet corporate data:

(a) The Company's "expansion strategy" had been formulated without benefit of professional marketing surveys, and, in fact, the Company's expansion was not pursuant to a coherent, well-thought-out strategy at all, but rather was haphazard and ad hoc, wholly lacking in orderly or long-term milestones or goals;

(b) Hamlet had not performed any adequate feasibility studies showing that its expansion plans were feasible or achievable or that Hamlet had sufficient financial capability to finance that expansion program;

(c) Opening new restaurants could not be financed through internally generated funds or in conjunction with the Company's revolving line of credit, but rather would require the Company to continuously increase its debt load, thereby incurring increasing interest obligations which would adversely affect earnings and earnings per share;

(d) In addition to needing additional external financing, the Company's expansion plans critically relied on its ability to maintain or increase revenues and earnings from the older restaurants, which, for the reasons stated herein, was unlikely, but without which the expansion program would collapse;

(e) In order to artificially increase reported earnings, the Company improperly capitalized pre-opening expenses for its new restaurants and was amortizing those expenses over an unreasonable period of time, namely, two years;

(f) In contrast to defendants' glowing reports about the results from newly-opened restaurants, in fact defendants knew that

1  they were failing to provide Hamburger Hamlet with planned,
2  forecast, and/or adequate return on investment so as to justify the
3  significant costs involved in opening and then operating these
4  additional outlets;

5     (g)  The Company was unreasonably deferring necessary
6  restaurant maintenance, upgrades, and remodeling so as to avoid
7  incurring expenses which would adversely impact net income and
8  earnings per share;

9     (h)  Despite the Company's statements about remodeling,
10  the Company had extensive remodeling still to perform, because most
11  of the restaurants retained their dated look, and this would
12  involve substantial expense which would adversely affect net income
13  and earnings per share;

14     (i)  The combination of new unit openings and necessary
15  remodeling of older units would and did leave the Company with
16  increasing financing requirements during the Class Period which
17  made defendants' publicly stated "expansion strategy" impossible to
18  achieve;

19     (j)  In connection with the sale of one of its
20  restaurants prior to the IPO, the Company had taken a note
21  receivable and had guaranteed the purchaser's obligations under its
22  lease.  In order to inflate assets and earnings by material
23  amounts, the Company failed to disclose and reserve for the
24  guarantee and failed to write-off or reserve against the note, even
25  though defendants knew that payment of the note by the purchaser
26  was highly unlikely and that Hamlet's obligations under the
27  guarantee would be triggered;

28

- 42 -

(k)   Hamlet financial statements during the Class Period overstated Hamlet net income, earnings per share and stockholders' equity because the Company failed to properly expense costs and obligations and to write-off certain assets and capital items or to establish adequate reserves;

(l)   Hamlet was not fairly presenting or reporting its results from operations and its financial statements in conformity with GAAP and SEC requirements;

(m)   Hamlet was suffering from significant management failures, shortcomings, and disagreements at the highest levels over the Company's expansion plans and accounting practices, which disagreements led to the replacement of defendant Brockman as Chief Financial Officer, and ultimately his resignation as president;

(n)   Demand for the Company's product had softened, and restaurant managers and the customers themselves had indicated that promotions and discounts would be necessary in order to maintain sales, which would adversely affect earnings and the Company's ability to expand;

(o)   Defendants knew that Hamlet's customer base consisted primarily of aging, repeat customers, that frequency of use had declined, and that new customers would have to be attracted via promotions, fresher menu items, and more appealing surroundings, all of which would increase expenses and adversely impact earnings and the ability to open new restaurants;

(p)   The Hamburger Hamlet menu had become too large to be profitable, because inventories were difficult and expensive to manage, product consistency was suffering, and longer service times

- 43 -

1    were necessary, all of which had a negative impact on sales and

2    earnings;

3               (q)  Defendants knew from in-store surveys and from

4    feedback by their store managers that, for Southern California,

5    Hamlet's menu had become outdated, with potential customers

6    demanding fresher, lower-calorie selections rather than the

7    Company's traditional emphasis on heavy foods and oversize

8    portions, all of which was having an adverse effect on sales and

9    earnings in the Company's core market;

10              (r)  Other hamburger chains were offering customers price

11   discounts in Southern California and elsewhere which was putting

12   the Company at a competitive disadvantage and which would require

13   Hamlet to lower its prices to stay competitive, thereby decreasing

14   earnings and cash flow and impairing the Company's ability to open

15   additional units;

16              (s)  The Company knew that the leases on a number of its

17   older restaurants were approaching termination and that re-

18   negotiation of those leases would result in higher rental costs or

19   the loss of important leases, both of which would adversely affect

20   earnings and impair the Company's ability to expand; and

21              (t)  Defendants had no adequate basis in fact for their

22   positive statements, forecasts and projections regarding revenue

23   growth, earnings growth, reduction of expenses, and expansion of

24   facilities, all of which were critical to the market's evaluation

25   of the Company's stock.  Rather, defendants possessed undisclosed

26   information directly contrary to their public statements including,

27   inter alia, that they faced a shortfall of internally generated

28   funds to finance expansion; that their "expansion strategy" lacked

- 44 -

proper foundation and was the subject of intense dissension and conflict among top management; that substantial necessary expenses which had long been postponed would soon have to be incurred at the expense of earnings; that Hamlet was suffering a deterioration in true earnings as competition was forcing the Company to adopt price cuts and menu changes; and that their restaurants suffered a significant marketing disadvantage as a result of dated decor, aging facilities, a heavy menu, and lack of promotions.

### THE TRUE FACTS ARE REVEALED

74.   Beginning on April 1, 1993 and continuing throughout 1993 and into 1994, the true facts about Hamlet and its internal problems were revealed.   On April 1, in a special news release, Hamlet announced that, notwithstanding the upbeat statements about the decrease in fourth quarter 1992 earnings, its first quarter 1993 same-store revenues were likely to be 5.1% below those of the preceding year, implying that earnings would be adversely impacted by a substantial amount.   During the subsequent months, the following facts, *inter alia*, were revealed:

(a)   The Company announced first quarter 1993 earnings of only $0.11 per share, over 30% below the prior quarter's earnings, over 30% below earnings for the first quarter of 1992, and well below the Class Period earnings estimates published by securities analysts in consultation with and with the approval of the Company;

(b)   Second quarter 1993 earnings dropped even more, to only $0.05 per share, a decrease of more than 50% from the prior quarter, a decrease of more than 70% from the second quarter of 1992, and well below the Class Period earnings estimates published

1  by securities analysts in consultation with and with the approval
2  of the Company;

3         (c)   Third quarter 1993 earnings were only $0.10 per
4  share, over 50% below earnings for the third quarter of 1992, and
5  well below the Class Period earnings estimates published by
6  securities analysts in consultation with and with the approval of
7  the Company;

8         (d)   In the fourth quarter of 1993, the Company posted a
9  loss for the first full quarter since the IPO;

10         (e)   The Company therefore reported fiscal 1993 results
11  drastically below those which had been forecast during the Class
12  Period with the concurrence and support of the Company;

13         (f)   The Company was forced to close its Woodland Hills
14  store because it was unsuccessful in negotiating a new lease.  That
15  restaurant, therefore, had to be relocated, at great expense, which
16  adversely affected earnings;

17         (g)   Defendant Brockman, who had served as Chief
18  Financial Officer, was replaced in that position by Douglas Haley;

19         (h)   The Company wrote-off a note receivable in the
20  amount of $486,000 and reserved approximately $65,000 for potential
21  future lease obligations and legal fees;

22         (i)   In order to promote sales, the Company introduced
23  necessary menu promotions whereby discounts were given and specials
24  were run;

25         (j)   The Company announced a program of renovating and/or
26  remodeling all of its Southern California restaurants;

27         (k)   The Company announced a decrease in the number of
28  stores it expected to open in 1993;

1          (1)   The Company adopted a new menu and launched an

2  expensive marketing effort in order to address the problems

3  defendants had known existed during the Class Period; and

4          (m)   Defendant Brockman resigned as President of Hamlet.

5     75.  As a result of the revelation of the foregoing facts, the

6  price of Hamlet stock decreased to less than $6 per share – 70%

7  below its Class Period high of approximately $21 per share.

8  <div align="center">**INSIDER SALES**</div>

9     76.  While Hamlet and its officials were issuing favorable

10  statements about Hamlet's finances, business and future prospects,

11  certain individual defendants sold 114,500 shares of the Company's

12  common stock they owned for proceeds of over $2 million, thereby

13  profiting from the artificial inflation in the price of the stock

14  which their tortious conduct had created.  Notwithstanding their

15  access to confidential information as a result of their status as

16  directors and/or officers of the Company and their corresponding

17  duty to disclose the adverse material facts set forth herein, the

18  individual defendants, as listed below, sold Hamlet shares at the

19  following inflated prices during the Class Period:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| McFall, T. | 09/25/92 | 2,500 | 14.5 | $ 36,250 |
| | 09/28/92 | 2,500 | 14.5 | $ 36,250 |
| | 09/30/92 | 2,000 | 15.5 | $ 31,000 |
| | 11/20/92 | 1,500 | 17.5 | $ 26,250 |
| | 11/20/92 | 1,000 | 17.25 | $ 17,250 |
| | 11/25/92 | 2,500 | 16.88 | $ 42,200 |
| | 11/25/92 | 1,000 | 17.25 | $ 17,250 |
| | 12/01/92 | 4,000 | 17.25 | $ 69,000 |
| | 12/07/92 | 7,000 | 20 | $ 140,000 |
| | 12/08/92 | 22,500 | 19.89 | $ 447,525 |
| | 12/16/92 | 1,000 | 18 | $ 18,000 |
| | 12/21/92 | 5,000 | 18.5 | $ 92,500 |
| | 12/29/92 | 50,000 | 17.5 | $ 875,000 |
| | | 102,500 | | $1,848,475 |

| | | | | | |
|---|---|---|---|---|---|
| Levie, A. | 11/04/92 | 2,000 | 16.5 | $ | 33,000 |
| | | 2,000 | | $ | 33,000 |
| Brockman, P. | 12/04/92 | 4,000 | 18.75 | $ | 75,000 |
| | 12/04/92 | 6,000 | 19 | $ | 114,000 |
| | | 10,000 | | $ | 189,000 |
| Grand Total | | 114,500 | | | $2,070,475 |

## PLAINTIFF'S CLAIMS FOR RELIEF

### COUNT I

**CLAIM FOR VIOLATIONS OF §10(b) OF
THE EXCHANGE ACT AND RULE 10b-5
AGAINST ALL DEFENDANTS**

77.  Plaintiff incorporates by reference ¶¶1 through 76.  This Count is asserted against all defendants.

78.  During the Class Period, the defendants individually and in concert, directly and indirectly, engaged and participated in or aided and abetted a continuous course of conduct and conspiracy to conceal adverse material information about the business, finances, financial condition and future business prospects of Hamlet as specified herein.  Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of conduct as herein alleged in an effort to maintain an artificially high market price for the securities of Hamlet, which included the making of or participation in the making of untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Hamlet, its finances and business, in light of the circumstances under which they were made, not misleading and engaged in transactions, practices, and courses of business which operated as a fraud and deceit upon the purchasers of Hamlet stock during the Class Period.

- 48 -

79.   The purpose and effect of this scheme was to artificially inflate the price of Hamlet publicly-traded common stock during the Class Period to induce representative plaintiff and members of the Class to purchase Hamlet common stock at artificially inflated prices so that defendants could enrich themselves at the expense of the public purchasers.

80.   During the Class Period, defendants issued public statements and reports including financial statements and other reports, releases and statements as described hereinabove, which were materially false and misleading in violation of those provisions of federal and state law sued for herein.  Said reports, releases and statements were materially false and misleading in that they failed to disclose material adverse information about Hamlet's business, results from operations, operations, earnings, financial condition and future business prospects.

81.   Each of the defendants herein knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements and omissions would adversely affect the integrity of the market in Hamlet common stock and artificially inflate or maintain the prices of such stock.  Defendants, by acting as described herein, did so knowingly or in such a reckless or grossly negligent manner as to constitute a deceit and fraud upon representative plaintiff and members of the Class.

82.   As a result of the dissemination of the aforementioned false and misleading reports, releases and financial statements and manipulative conduct, the market price of Hamlet common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Hamlet's business and financial

1   condition concealed by defendants, representative plaintiff and the
2   members of the Class purchased Hamlet stock at artificially
3   inflated prices, relying upon the integrity of the market, and were
4   damaged thereby.

5   83. Had representative plaintiff and the members of the Class
6   known of the materially adverse information not disclosed by the
7   defendants, they would not have purchased Hamlet securities at the
8   artificially inflated prices they did.

9                               COUNT II

10      CLAIM FOR VIOLATIONS OF §20(a) OF THE EXCHANGE ACT
        AGAINST DEFENDANT HAMBURGER HAMLET RESTAURANT, INC.
11        AND INDIVIDUAL DEFENDANTS MCFALL AND BROCKMAN

12      84. Plaintiff incorporates by reference ¶¶1 through 83. This
13  Count is asserted against defendants Hamlet, McFall, and Brockman.
14      85. The individual defendants named in this Count acted as
15  controlling persons of the Company within the meaning of §20 of the
16  Exchange Act. By reason of their stock ownership and/or positions
17  as senior officers and/or directors, as alleged above, these
18  defendants had the power and authority to cause the Company to
19  engage in the wrongful conduct complained of herein. Hamlet in
20  turn controlled each of the individual defendants.

21      86. By reason of such wrongful conduct, the individual
22  defendants named in this Count and Hamlet are liable pursuant to

23

24

25

26

27

28

                              - 50 -

1 §20(a) of the Exchange Act.  As a direct and proximate result of

2 their wrongful conduct, plaintiff and other members of the Class

3 suffered damages in connection with their purchases of the

4 Company's securities during the Class Period.

5 <center>**PLAINTIFF'S PRAYER FOR RELIEF**</center>

6 WHEREFORE, representative plaintiff demands judgment

7 individually and on behalf of the Class as follows:

8 1.  Determining that the instant action is a proper class

9 action maintainable under Rule 23 of the Federal Rules of Civil

10 Procedure;

11 2.  Against each defendant and in favor of the representative

12 plaintiff and all members of the Class for damages in an amount

13 determined to have been sustained by representative plaintiff and

14 the members of the Class;

15 3.  Awarding representative plaintiff and members of the

16 Class the costs of this suit, including reasonable attorneys' and

17 experts' fees and other disbursements;

18 4.  Against each defendant for punitive and exemplary

19 damages;

20 5.  Granting representative plaintiff equitable relief

21 including an attachment and/or a freeze of the defendants' assets

22 and/or injunctive relief against the disposition of these assets;

23 and

24 6.  Such other and further relief as may be just and proper.

25

26

27

28

1

<u>JURY DEMAND</u>

2

Plaintiff demands a trial by jury.

3

DATED:   March 23, 1994

4

MILBERG WEISS BERSHAD
  HYNES & LERACH
WILLIAM S. LERACH
JOHN E. GRASBERGER

5

6

7

WILLIAM S. LERACH

8

9

600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058

10

11

WRIGHT & BONDS
EDWARD L. WRIGHT
STEVEN E. CAULEY
Centre Place, Suite 900
Little Rock, AR  72201
Telephone:  501/376-2500

12

13

14

Attorneys for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLNTS\HAMLET.CPT

- 52 -